**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 17 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LINDA R. STUART; LISA YODER;
BRYAN STUART; SMYTH STUART,

      Plaintiffs-Appellees -
      Cross-Appellants,

and

BRUCE STUART; BARCLAY
STUART,

      Plaintiffs - Cross-Appellants,

v.

DALE JACKSON; BRANNON
DAVIS in their individual capacities,

      Defendants-Appellants -
      Cross-Appellees,

  and

ROBERT DODD; MICHAEL PAYNE;
JACKSON ANDREWS; RICHARD
CROSS; DEREK IRVINE; JAMES
EHRLICH; DOUGLAS SCAUT;
MIKE DELAROSA in their individual
capacities; DALE REA in his
individual and official capacities,

      Defendants - Cross-Appellees

Nos. 00-1295, 00-1307
(District of Colorado)
(D.C. No. 98-WY-1710-CB)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **BALDOCK**, Circuit Judges, and **VANBEBBER**,[**] Senior District Judge.

## I. INTRODUCTION

In this action brought pursuant to 42 U.S.C. § 1983, plaintiffs-appellees/cross-appellants Linda Stuart, Bryan Stuart, Smyth Stuart, and Lisa Yoder and plaintiffs/cross-appellants Bruce Stuart and Barclay Stuart brought claims against members of the Fremont County, Colorado, Sheriff's Department ("County defendants"), including deputy sheriffs Brannon Davis and Dale Jackson, and members of the Colorado Department of Corrections ("DOC") ("State defendants") for violations of their constitutional rights. After a trial in the United States District Court for the District of Colorado, a jury returned a verdict for the defendants on all counts except for the claim of unreasonable

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Circuit Rule 36.3.

[**]Honorable G. Thomas VanBebber, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

seizure through use of handcuffs, for which the jury awarded Linda Stuart, Lisa Yoder, Bryan Stuart, and Smyth Stuart damages.

Defendants Davis and Jackson appeal the district court's denial of their motions for judgment as a matter of law ("JMOL") at the end of plaintiffs' opening statement, denial of their motion for JMOL on the handcuffing claim, the district court's evidentiary rulings permitting evidence at trial of training and supervision of the County defendants, and the district court's remarks and questioning during the testimony of defendant Sheriff Dale Rea. The plaintiffs cross-appeal the district court's grant of summary judgment for the County defendants on their claims of excessive force through use of rifles and the failure to train and supervise. This court exercises appellate jurisdiction under 28 U.S.C. § 1291, and **affirms** the district court's rulings in all respects.

## II. FACTUAL BACKGROUND

The relevant undisputed facts, considered in the light most favorable to the plaintiffs, are as follows.

On the morning of August 7, 1997, Bruce Stuart, Bryan Stuart, and Smyth Stuart were mowing tall grass on the Stuart property. They had a rifle with them to shoot snakes. Early in the afternoon, a dispute arose between the Stuarts and their neighbors, the Comptons. Around 4 p.m., three deputies from the Fremont County Sheriff's Department responded to a call from Bruce Stuart alleging that

Robert Compton had assaulted Stuart and his son Smyth. Compton told the deputies upon questioning that, during the confrontation, Smyth Stuart had an automatic rifle resembling an AR-15. As a result of the investigation, the deputies believed they had sufficient evidence to charge Smyth Stuart with felony menacing and Bryan Stuart with assault, but decided to cite them at a later time when more officers would be available to assist.

At approximately 10 p.m. that night, deputy sheriffs responded to a call, placed this time by Robert Compton, reporting a second confrontation between the Comptons and the Stuarts. When the officers came to the Stuart residence, Bruce Stuart carried a weapon resembling an AK-47 in one hand and a tape recorder in another. Stuart announced himself, told the officers that he had a weapon, laid the rifle down, and began talking with the officers. Deputy Jackson Andrews noted the odor of alcohol on Stuart's breath. After speaking with Stuart, Andrews believed he had probable cause to cite him for possession of a weapon while under the influence of alcohol, in violation of Colorado state law.[1] Deputy Andrews, however, decided not to issue the citation until a later time.

On the morning of August 8, 1997, the defendants obtained a search warrant for the Stuart residence to obtain the AK-47 and AR-15 weapons. A

---

[1]"A person commits a . . . misdemeanor if: . . . (d) He has in his possession a firearm while he is under the influence of intoxicating liquor . . . ." Colo. Rev. Stat. § 18-12-106(d).

dozen officers, Fremont County deputy sheriffs Jackson Andrews, Robert Dodd, Michael Payne, Dale Jackson, Richard Cross, Derek Irvine, James Ehrlich, Brannon Davis, Douglas Scaut, and Mike Delarosa, accompanied by Alex Wold and Steve McQuary from the DOC, executed the search. Plaintiffs Linda Stuart, Lisa Yoder, Bryan Stuart, and Smyth Stuart ("the occupants") were inside the Stuart residence at the time the defendants executed the search. Bruce Stuart and Barclay Stuart were not present during the search.

Upon arriving at the Stuart home, deputies surrounded the residence in a semi-circle, secured their positions, and pointed eight or nine weapons, including semi-automatic assault weapons, handguns, and riot shotguns, at the house. Officers approached the front door, and Linda Stuart came to the door. Deputy Andrews informed her that he had a search warrant for an AK-47 and an AR-15. Almost immediately thereafter, Linda Stuart and Smyth Stuart, accompanied by officers, retrieved the two weapons. After these weapons were turned over to the deputies, the occupants were allowed to sit on the steps outside the residence unrestrained for approximately fifteen minutes. When the deputies continued their search of the Stuart residence, Smyth Stuart objected that they were going beyond the scope of the warrant. At this point, the deputies searched the occupants, handcuffed them, and placed them in a van for approximately an hour

and fifteen minutes as the officers continued their search of the Stuart residence. The defendants did not remove the handcuffs until the end of the search.

On November 25, 1998, plaintiffs filed a complaint in the United States District Court for the District of Colorado against the County and State defendants, including county deputy sheriffs Dale Jackson and Brannon Davis and Fremont County Sheriff Dale Rea, alleging, *inter alia*, violations under 42 U.S.C. § 1983 for excessive force through use of rifles, unreasonable seizure through the use of handcuffs, and the County's failure to adequately train and supervise the County defendants.

Pursuant to the County defendants' motion to dismiss and motion for summary judgment and the State defendants' motion for summary judgment, the court granted summary judgment to the County defendants on the excessive force and failure to train claims, but denied summary judgment on the unreasonable seizure claim, which proceeded to trial. The district court granted summary judgment to the State defendants on all counts.

The five-day jury trial began on March 6, 2000. At the conclusion of the plaintiffs' opening statements, the defendants filed a written motion for judgment as a matter of law ("JMOL") under Rule 50(a) of the Federal Rules of Civil Procedure. The defendants argued, *inter alia*, that they were entitled to JMOL on the handcuffing claim because the plaintiffs had failed to identify the individual

defendants responsible for handcuffing the defendants, a necessary element of any § 1983 claim. *See Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996). The district court denied the motion.

At the close of plaintiffs' case-in-chief, the defendants renewed their motion for JMOL on the handcuffing claim, further contending that the undisputed facts demonstrated that the defendants' actions were objectively reasonable. The district court granted the defendants' JMOL motion for all defendants except defendants Davis and Jackson. By this point in the trial, plaintiffs Lisa Yoder and Linda Stuart had identified Davis as the deputy who had handcuffed them on August 8. Although defendant Jackson did not testify during the plaintiffs' case-in-chief, the district court allowed the handcuffing claim against him to proceed to trial based on the parties' joint representation that Jackson would testify that he had handcuffed the plaintiffs. At the close of the evidence, the defendants made an oral Rule 50(b) motion which the district court apparently did not decide.

In its verdict returned on March 10, 2000, the jury found for the defendants on all counts except for the handcuffing claim. The jury found that defendants Davis and Jackson had committed an unreasonable seizure of the plaintiffs through the use of handcuffs, and awarded Bryan Stuart, Linda Stuart, Smyth Stuart, and Lisa Yoder $25,000 each in damages.

## III. DISCUSSION

### A. Defendants' Appeal

#### 1. Denial of Motions for JMOL on Handcuffing Claim

The defendants argue that the district court erred in failing to grant their JMOL motion after the plaintiffs' opening statements for failing to identify the defendants who personally participated in the handcuffing, and for failing to grant the defendants' JMOL motion for insufficient evidence to support the jury's verdict on the handcuffing claim.

This court reviews *de novo* the district court's denial of JMOL. *See Rice v. Office of Servicemembers' Group Life Ins.*, 260 F.3d 1240, 1250 (10th Cir. 2001). JMOL is proper if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). The motion should be granted only if, after drawing all reasonable inferences in favor of the nonmoving party, "the evidence points but one way." *Rice*, 260 F.3d at 1251. The court may not make its own determinations of witness credibility or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Rather, it should consider the evidence favoring the nonmovant as well as the uncontradicted and unimpeached evidence favoring the movant furnished by disinterested witnesses. *See id.* at 151.

##### a) Defendants' JMOL Motion at Close of Plaintiffs' Opening Statements

Rule 50(a) of the Federal Rules of Civil Procedure provides that a motion for a judgment as a matter of law "may be made at any time before submission of the case to the jury." Fed. R. Civ. P. 50(a)(2). The Rule also provides, however, that JMOL motions may be brought after "a party has been fully heard on an issue." Fed. R. Civ. P. 50(a)(1).

This court concludes that the district court did not err in denying the defendants' motion for JMOL at the end of plaintiffs' opening statements. Although Rule 50 states that a party may bring a motion for JMOL at any time, the Advisory Committee Notes to Rule 50 make clear that a party may do so only after the opposing party has had the opportunity to present evidence bearing on that motion:

> the court [is authorized] to perform its duty to enter judgment as a matter of law at any time during the trial, *as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case*. Thus, [Rule 50] authorizes the court to consider a motion for judgment as a matter of law *as soon as a party has completed a presentation on a fact essential to that party's case*. Such early action is appropriate when economy and expedition will be served. In no event, however, should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and *been afforded an opportunity to present any available evidence bearing on that fact*.

Fed. R. Civ. P. 50 advisory committee's note (1991) (emphases added).

-9-

Here, the plaintiffs had not been given the opportunity to present its case on the handcuffing claim, much less complete it. Nor were the plaintiffs required to identify the individual or individuals they believed handcuffed the plaintiffs during their opening statement. By the close of plaintiffs' case, however, Linda Stuart and Lisa Yoder had identified defendant Davis as the deputy who had handcuffed them. Moreover, the plaintiffs had subpoenaed defendant Jackson and would have called him during their case-in-chief were it not for a scheduling problem. Defendant Jackson subsequently testified during the defendants' case, and stated that he had handcuffed at least two of the plaintiffs. Thus, the particular deficiency in the plaintiffs' handcuffing claim identified in the defendants' JMOL motion had been remedied by the close of the plaintiffs' case-in-chief.

The only case the defendants cite for the proposition that a motion for JMOL is appropriate after a party's opening statement is not to the contrary. *See Am. & Foreign Ins. Co. v. Gen. Elec. Co.*, 45 F.3d 135, 139 (6th Cir. 1995) (explaining that "[n]othing in Rule 50 . . . requires that a motion for a directed verdict come at specific time in the case," but not otherwise dispensing with the Rule's requirement that a party be fully heard before a court considers a motion for JMOL). Accordingly, the district court properly denied the defendants' motion for a JMOL at the close of the plaintiffs' opening statement.

*b) Defendants' JMOL Motion for Insufficient Evidence to Support Jury's Verdict*

At the outset, this court must resolve the parties' dispute whether the defendants' use of handcuffs is an excessive force claim or an unreasonable seizure claim. The defendants argue that the district court erred in denying their post-verdict JMOL motion because the plaintiffs did not produce any evidence of physical injury caused by the handcuffing.

In *Bella v. Chamberlain*, cited by the defendants in support of this assertion, this court stated that "we have never upheld an excessive force claim without some evidence of physical injury." 24 F.3d 1251, 1257 (10th Cir. 1994). *Bella*, however, addressed only the specific context of excessive force claims that arise outside a Fourth Amendment seizure. *See id.* In *Graham v. Connor*, the Supreme held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. 386, 395 (1989). Here, the plaintiffs' handcuffing claim clearly arose out of a Fourth Amendment seizure. Thus, even if this court were to construe the defendants' handcuffing as a use of excessive force, it would not apply the physical injury requirement of *Bella*. Because this court agrees with the district court's conclusion that "[t]his is not a case of excessive use of force, but one involving an unreasonable seizure," the district

court did not err in denying the defendants' JMOL motion simply because the plaintiffs failed to prove physical injury.

Turning to the sufficiency of the evidence of unreasonable seizure, the parties do not challenge the application of the objective reasonableness standard to the plaintiffs' unreasonable seizure claim. This court, however, has reservations whether objective reasonableness is the appropriate standard to apply to the handcuffing claim, given that the plaintiffs' detention falls under an explicit and categorical exception to the general requirement that all seizures be based on probable cause. *See Michigan v. Summers*, 452 U.S. 692, 701-705 & nn.19, 21 (1981); *United States v. Edwards*, 103 F.3d 90, 93-94 (10th Cir. 1996); *United States v. Ritchie*, 35 F.3d 1477, 1481-84 (10th Cir. 1994). Nevertheless, since the parties here do not contest the application of the objective reasonableness standard, this court will review the issue applying that standard. "This court . . . will not craft a party's arguments for him." *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999).

In its order denying the defendant's motion for a JMOL, the district court stated:

> evidence adduced at trial was sufficient to support a jury finding that (1) none of the Plaintiffs tried to escape; (2) sheriff's deputies outnumbered Plaintiffs nearly three to one; (3) Plaintiffs cooperated by surrendering weapons; (4) the deputies allowed Plaintiffs to handle the weapons; (5) Plaintiffs were dressed in light, summer

clothing such that it was unlikely they would be concealing weapons; (6) Plaintiffs were allowed to sit, unguarded for fifteen minutes prior to being handcuffed; and (7) Plaintiffs made no threats and did not attempt to frustrate the deputies' search.

The defendants do not dispute the district court's characterization of the evidence. The fact that the defendants cooperated with the search, made no threats, and were unguarded for some time after the search began indicates that, contrary to the defendants' assertions, the evidence does not "point[] but one way." *Rice*, 260 F.3d at 1251 (quotation omitted). Thus, viewed in the light most favorable to the plaintiffs, a reasonable jury could have determined that handcuffing the plaintiffs under the circumstances was objectively unreasonable.

2. Evidence of Training and Court's Questioning of Sheriff Rea

The defendants contend that the district court erroneously denied their motion *in limine* to exclude testimony and exhibits concerning the defendants' training and supervision. The defendants further argue that the district court's improper questioning of Sheriff Rea during trial prejudiced the jury. The plaintiffs argue that the defendants waived this latter claim by not objecting to the court's questioning and remarks at trial. Although the defendants concede that they did not object to these allegedly prejudicial remarks, they argue that the issue was properly preserved for appeal through their motion *in limine* to exclude evidence concerning training or supervision.

This court generally reviews the district court's evidentiary rulings for abuse of discretion. *See Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1001 (10th Cir. 2001). Under the abuse of discretion standard, the district court's ruling will not be disturbed unless this court has a definite and firm conviction that the lower court "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Pandit v. Am. Honda Motor Co.*, 82 F.3d 376, 379 (10th Cir. 1996). If the appellant failed to make a contemporaneous objection at trial, however, this court reviews under the more rigorous standard of plain error, requiring that the substantial rights of the party must be affected. *See* Fed. R. Evid. 103(d). In civil cases, this court has limited the plain error exception to errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See Polys v. Trans-Colo. Airlines, Inc.*, 941 F.2d 1404, 1408 (10th Cir. 1991).

The district court did not abuse its discretion in denying the defendants' motion *in limine* to exclude evidence about the Fremont County Sheriff Department's training procedures. According to the defendants, this ruling impermissibly allowed the jury to consider testimony about the defendants' underlying motivation and subjective intent when the issue at trial was limited to the reasonableness of handcuffing the plaintiffs. Rea's trial testimony about the standard departmental procedures regarding handcuffing, however, was relevant

to the issue of objective reasonableness. These defendant law enforcement officials faced civil liability for alleged constitutional violations, and evidence about the department's operational protocol and standard procedures was material even though the district court had earlier granted summary judgment for the defendants on the failure to train claim. Because the district court did not make a clear error of judgment in permitting Rea's testimony, this court will not disturb the ruling.

Nor did the district court's questioning of Sheriff Rea at trial constitute plain error. During direct examination by the plaintiffs, the court asked questions about why the sheriff did not personally participate in the search.[2] Additionally,

_____

[2]During a line of questioning by plaintiffs' counsel about the operations of the tactical support unit at the department, the following colloquy occurred:

> THE COURT: Sheriff, why didn't you go with [the tactical support unit to the Stuart residence]?
>
> THE WITNESS: I don't always participate in these. In fact, I seldom participate in them anymore unless—
>
> THE COURT: You are the elected official; you have got the good judgment. Why didn't you go and supervise your men?
>
> THE WITNESS: Because I have people that are highly more proficient with regard to their training in that aspect of it than I am.
>
> THE COURT: But you are the elected one.
>
> THE WITNESS: That's correct.

-15-

during cross examination by defense counsel about the sheriff's department's chain of command, the court asked: "Yeah, but Sheriff, you remember when Theodore Roosevelt led the charge off San Juan Hill in Cuba in the Spanish American War, doesn't the sheriff usually get out in front on things like this [search] to show the people that he is doing his job?" The defendants argue that the district court's questions confused and misled the jury and constituted plain error.[2]

Although the substance of the district court's questioning of Sheriff Rea was not necessarily appropriate, the defendants' thorough questioning of Sheriff Rea about the sheriff department's procedures, training, operations, and chain of command explained why he decided not to personally participate in the search of the Stuart residence. Moreover, the defendants have not presented any arguments as to how the court's questions and remarks affected their substantial rights. After a careful review of the transcript of Sheriff Rea's trial testimony, this court

THE COURT [to plaintiffs' counsel]: Go ahead.

[2]As part of the defendants' argument, they cite to a comment the district court judge made during the arguments for the motion *in limine* to exclude Rea's testimony: "[I]t seems to me that if I were on the jury and the sheriff didn't testify, I would feel that something had been left out. I think the – I would want to see the boss and see what kind of fellow he is and what they have been taught, so I think it's relevant." Since that particular comment was made outside the jury's presence, it could not have had a prejudicial impact on the jury's deliberations.

concludes that the district court's questioning did not affect the defendants' substantial rights or the fairness or integrity of the trial.[3]

## B. Plaintiffs' Cross-Appeal

In their cross-appeal, plaintiffs contend that the district court erred in granting the defendants' summary judgment motion on grounds of qualified immunity for the claims of excessive force in pointing their rifles at the plaintiffs; granting the defendants' summary judgment motion on the failure to train claim; and dismissing Sheriff Rea as a defendant. As discussed below, none of these claims have merit.

Qualified immunity shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to avoid excessive disruption of governmental functions and to resolve insubstantial claims in the early stages of litigation. *See Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001). The scope of qualified immunity protection extends "not merely to [the right to] avoid standing

---

[3]In seeking to avoid the plain error standard, defendants claim that their motion *in limine* served as an objection. The argument is meritless and deserves no further comment.

trial, but also to avoid the burdens of such pretrial matters as discovery." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996) (citation and quotation omitted).

This court reviews the grant of a summary judgment *de novo*. *See Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998). The Supreme Court has recently clarified the standards for reviewing summary judgment motions raising the qualified immunity defense. *See Saucier*, 121 S. Ct. at 2155-59. As a threshold inquiry, this court must first determine whether the facts alleged, taken in the light most favorable to the nonmoving party, show that the defendants' conduct violated a constitutional right. *See id.* at 2156.[4] "Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in

---

[4]The Supreme Court emphasized that it was important to conduct this threshold inquiry first because

> [i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question of whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

*Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001).

expensive and time consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). If the nonmoving party fails to meet its burden on this threshold inquiry, the qualified immunity inquiry comes to an end. *See Saucier*, 121 S. Ct. at 2156.

If, however, the plaintiffs allege facts showing a constitutional violation, then "the next, sequential step is to ask whether the right was clearly established." *Id.* In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* This inquiry is determined in the specific context of the case, and not as a broad general proposition. *See id.*

1. Excessive Force Claim

As an initial matter, this court must determine whether the plaintiffs have alleged facts showing a constitutional violation. It is well settled that excessive force claims must be analyzed under the Fourth Amendment's objective reasonableness standard. *See Saucier*, 121 S. Ct. at 2156, 2158; *Graham*, 490 U.S. at 395. The reasonableness of the officer's actions must be assessed from the officer's vantage point at the scene of the alleged violation. *See Saucier*, 121 S. Ct. at 2158; *Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation."). Such an assessment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quotation omitted). In excessive force cases, the reviewing court should consider the facts and circumstances of each particular case, including such nonexhaustive factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Saucier*, 121 S. Ct. at 2158 (citation and quotation omitted).

The Supreme Court cautioned in *Saucier*, however, that this reasonableness inquiry is independent and separate from the qualified immunity analysis, which requires that the court determine whether the right allegedly violated was clearly established. *See id.* at 2158 ("The inquiries for qualified immunity and excessive force remain distinct . . . ."). In contrast to the *Graham* constitutional violation analysis, which focuses on the reasonableness of the official's *actions*, the qualified immunity analysis probes whether the officer's *belief* in the state of the law was reasonable:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant

-20-

legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 2158. Thus, even if the officer unreasonably used force in violation of the Fourth Amendment, qualified immunity should be granted if the officer had a reasonable, albeit mistaken, belief about the legality of the officer's actions. *See id.* at 2158-59; *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987).[5]

In this case, construing the facts in the light most favorable to nonmovants, the plaintiffs have failed to allege a constitutional violation. Applying *Graham*'s balancing test, the plaintiffs have a Fourth Amendment interest to be free from unreasonable force when arrested or detained by a police officers. *See Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989).

The Supreme Court, however, has acknowledged that law enforcement's right to make an arrest or investigatory stop necessarily carries with it the right to use or threaten some degree of physical force. *See Graham*, 490 U.S. at 396. More specifically, this court has held that it is not unreasonable for officers to

---

[5]In so holding, the Court in *Saucier* rejected this court's precedents which conflated the Fourth Amendment and qualified immunity inquiries. *See, e.g.*, *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995); *Quezada v. County of Bernalillo*, 994 F.2d 710, 718 (10th Cir. 1991).

-21-

carry weapons when they enter the premises of a suspect who has a reputation for possessing firearms. *See Thompson v. City of Lawrence*, 58 F.3d 1511, 1516 (10th Cir. 1995). The facts and circumstances known to the officers at the time they executed the search warrant on August 8 would have caused a reasonable officer significant concern that any search of the Stuart residence would have been fraught with danger. Bruce Stuart had admitted that during the initial altercation on August 7, Smyth Stuart had a rifle with him. When the deputies returned later that evening in response to a call by Robert Compton, Bruce Stuart carried an AK-47 when the officers approached the Stuart residence. During this time, Smyth Stuart and Bryan Stuart were hidden from view and were armed with weapons. There had been a history of animosity between the Comptons and the Stuarts. Under these circumstances, the defendants were justifiably concerned for their safety to approach the Stuart residence with their rifles trained in order to execute the search warrant.[6]

Because this court concludes that the plaintiffs have failed to allege facts showing a constitutional violation, it need not address the further question of

---

[6]In their brief, the plaintiffs claim that, even after they had given the two weapons to the deputies and had been handcuffed and placed in a van, the deputies kept their weapons trained on them. The plaintiffs have not cited to anything in the record to support their contention. *See* Fed. R. App. P. 28(a)(9)(A); *Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 773 n.5 (10th Cir. 1999) ("In the absence of sufficient citation to record support for a party's allegations, we decline to search for the proverbial needle in a haystack.").

whether or not the right violated was clearly established. Accordingly, the district court did not err in granting the defendants' summary judgment motion on the excessive force claim.[7]

2. Failure to Train and Dismissal of Defendant Rea as a Defendant

Plaintiffs next argue that the district court erred in granting summary judgment for defendant Sheriff Dale Rea on the failure to train claim. They assert that the defendants' alleged constitutional deprivations during the search of the Stuart residence demonstrates a failure on the part of Fremont County and Sheriff Rea to adequately train the County's police officers in conducting searches and seizures of property and persons, and in the use of force. The plaintiffs do not allege that there exists a genuine issue of material fact regarding the defendants' alleged inadequate training. Although the plaintiffs' brief is unclear, the failure to train claim appears to be against Sheriff Rea in both his official and individual capacities.

*a. Claim Against Rea in His Individual Capacity*

In suits brought against officials in their individual capacities, officials may raise the defense of qualified immunity. *See Kentucky v. Graham*, 473 U.S. 159,

_____

[7]Plaintiffs urge this court to apply the four-factor test for determining constitutional violations from *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). The Supreme Court, however, has explicitly rejected the *Johnson* test in analyzing excessive force claims in § 1983 actions. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) (explaining that the *Johnson* test is "incompatible with proper Fourth Amendment analysis").

166-67 (1985). As discussed above, the first step in determining whether the plaintiffs can overcome the defense of qualified immunity raised by Rea is whether, construing the facts in the light most favorable to the plaintiffs, the plaintiffs have alleged facts showing a constitutional violation. *See Saucier*, 121 S. Ct. at 2156. In order to show a supervisor's failure to adequately train law enforcement officers amounted to a constitutional violation, the superior must have participated or acquiesced in the claimed constitutional deprivations. *See Meade v. Grubbs*, 841 F.2d 1512, 1527-28 (10th Cir. 1988). "Unless a supervisor has established or utilized an unconstitutional policy or custom, a plaintiff must show that the supervisory defendant breached a duty imposed by state or local law which caused the constitutional violation." *Id.* at 1528. The plaintiffs have not alleged facts to show that Sheriff Rea established unconstitutional training procedures, or that he violated any applicable law in training members of the Fremont County Sheriff's Department. In their first amended complaint, the plaintiffs allege that "[i]t is obvious from the actions of the Defendants at the Stuart Home on August 8th, 1997, that the training level of the Fremont County Sheriffs Department does not meet even the barest level of acceptability." Such bare allegations fail to meet the threshold inquiry *Saucier* requires. Accordingly,

the district court properly granted summary judgment on the failure to train claim against Rea in his individual capacity.[8]

### b. Claim Against Rea in His Official Capacity

Likewise, the plaintiffs' failure to train claim against Rea in his official capacity is unavailing. Unlike suits against officials in their individual capacities, qualified immunity does not bar suits against defendants in their official capacities. *See Kentucky v. Graham*, 473 U.S. at 167. "[A] section 1983 suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same." *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) (citation and quotation omitted). Thus, a plaintiff suing an official in his official capacity must prove the elements of a § 1983 suit against a municipality: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *See id.* at 1316 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

The plaintiffs have failed to demonstrate that Fremont County's alleged failure to adequately train its officers caused any constitutional violation in this

---

[8]Although the district court did not state the reasons in its order granting summary judgment on this portion of the failure to train claim, this court may affirm "on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (quotation omitted).

-25-

case. Inadequate police training may give rise to § 1983 liability only when the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a [municipal] 'policy or custom' that is actionable under § 1983." *Id.* at 389.

In their cross-appeal brief, the plaintiffs do not point to any evidence in the record which shows the substance of the County's training policies or procedures or the alleged inadequacies of any such policy. Likewise, the plaintiffs do not demonstrate how "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. The requirement that a municipal policy caused the alleged constitutional violations "will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the [municipality] is responsible." *Id.* at 389. In light of plaintiffs' failure to demonstrate how any of the County's training policies were inadequate, much less deliberately indifferent

to the rights of its citizens, this court affirms the district court's grant of summary judgment for defendant Rea in his official capacity.

Because this court concludes that the district court's grant of summary judgment was proper, the district court also properly dismissed Sheriff Rea as a defendant.

## IV. CONCLUSION

For the foregoing reasons, this court **AFFIRMS** the district court's denial of defendants' motion for judgment as a matter of law for failure to personally identify participants and for insufficiency of evidence on the handcuffing claim, as well as the court's evidentiary rulings on Rea's testimony. This court further **AFFIRMS** the district court's order granting summary judgment for the defendants on the excessive force through use of rifles and the failure to train claims, as well as the dismissal of Rea as a defendant in this litigation.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge